UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LESLIE A. FREEMAN,                    :
                                      :CIVIL ACTION NO. 3:15-CV-1616
          Plaintiff,                  :
                                      :(JUDGE CONABOY)
          v.                          :
                                      :
CAROLYN W. COLVIN,                    :
Acting Commissioner of                :
Social Security,                      :
                                      :
          Defendant.                  :
                                      :
_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (Doc. 1.)  She alleged disability beginning on June 1, 2012.  (R. 18.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Randy Riley, concluded in his May 29, 2014, decision that Plaintiff's severe impairments of depression, neuropathy, and tarsal tunnel syndrome did not alone or in combination meet or equal the listings.  (R. 20-22.)  He also found that Plaintiff had the residual function capacity ("RFC") to perform light work with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 22-26.)  ALJ Riley therefore found Plaintiff was not disabled under the Act from June 1, 2012, through the date of the decision.  (R. 26.)

With this action, Plaintiff asserts that the Acting

Commissioner's decision should be reversed or the matter should be remanded for the following reasons: 1) the ALJ erred by failing to find that Plaintiff met the listing for peripheral neuropathies; 2) the ALJ erred by affording insufficient weight to her treating physicians' opinions and ignoring their uncontradicted opinions; 3) the ALJ erred in not properly evaluating Plaintiff's mental impairments; 4) the ALJ erred in finding that Plaintiff had the RFC to perform light work; 5) the vocational expert's testimony was flawed because it was given in response to an incomplete hypothetical; 6) the ALJ's determination that Plaintiff was not entirely credible was not adequately explained; and 7) the ALJ erred in relying on the grid as a framework for his decision. (Doc. 6 at 2.)  After careful review of the record and the parties' filings, I conclude remand of this matter is appropriate.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB on October 23, 2012. (R. 18.)  The claim was  initially denied on February 28, 2013, and Plaintiff filed a request for a hearing before an ALJ on April 23, 2013.  (*Id.*)

ALJ Riley held a hearing on May 22, 2014.  (R. 18.) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Brian Bierley.  (*Id.*)  As noted above, the ALJ issued his unfavorable decision on May 29, 2014, finding that

2

Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 26.)

On June 16, 2014, Plaintiff filed a Request for Review with the Appeals Council.  (R. 7.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on June 16, 2015. (R. 1-4.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On August 18, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on December 21, 2015.  (Docs. 4, 5.)  Plaintiff filed her supporting brief on February 3, 2016.  (Doc. 6.)  Defendant filed her brief on March 2, 2016.  (Doc. 7.)  Plaintiff filed a reply brief on March 16, 2016.  (Doc. 8.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.  *Factual Background***

Plaintiff was born on March 1, 1961--she was fifty-one years old on the alleged disability onset date.  (R. 25.)  Plaintiff has a high school education and has past relevant work as a child care provider.  (R. 25.)

**1.  Impairment Evidence**

Plaintiff points to evidence from her family doctor, Don DeArmitt, M.D., her treating pain specialist, Michael F. Lupinacci, M.D., and her orthopedic surgeon, Brett Himmelwright, D.O.  (Doc. 6

at 5-6.)  In addition to these providers, Defendant cites evidence related to treatment Plaintiff received from the Pennsylvania Neurosurgery & Neuroscience Institute, Inc.  (Doc. 7 at 6-7.)

*a.   Don DeArmitt, M.D.*

In the months prior to her onset date, Dr. DeArmitt noted Plaintiff's chronic problems to be insomnia, iritis of both eyes and depression.  (R. 241.)  In March 2012, Plaintiff complained of hot flashes and warts and her review of systems was positive for mood swings.  (*Id.*)  Plaintiff elected to use over-the-counter medications to address her menopausal symptoms.  (R. 242.)

In April 2012, Plaintiff complained of leg numbness, reporting that it was constant and worsening, that she had burning and sharp pain in both feet, and she had associated symptoms that included decreased mobility, difficulty initiating sleep, joint tenderness, nocturnal awakening, nocturnal pain, and numbness, swelling and tingling of the legs.  (R. 244.)  Dr. DeArmitt's Assessment/Plan indicated peripheral neuropathy and Plaintiff was to take the medication as prescribed and return to neurology for follow up. (R. 249.)

Plaintiff complained of numbness in both feet in May 2012. (R. 247.)  She reported that the Lyrica which had been prescribed for the problem in April made her "feel loopy" and she inquired about a medication change.  (*Id.*)  Physical examination showed edema was present in both lower legs with a "1+" severity

4

estimation.  (R. 248.)

In June 2012 Plaintiff presented to Dr. DeArmitt with depression, complaining of difficulty falling asleep but denying diminished interest or pleasure, feelings of guilt, loss of appetite or thoughts of death or suicide.  (R. 251.)  He noted that the initial visit for the problem was on November 17, 2010.  (*Id.*) Plaintiff was directed to take medication as prescribed.  (R. 252.)

In August 2012, Plaintiff also complained of difficulty concentrating, diminished interest and pleasure, fatigue, and suicidal ideation.  (R. 254-55.)  Dr. DeArmitt increased the estrogen dosage to help alleviate the menopausal symptoms.  (R. 255.)  In September, Plaintiff denied loss of appetite or thoughts of death or suicide.  (R. 258.)

On January 31, 2013, Plaintiff presented to Dr. DeArmitt with left foot pain which had a gradual onset over the preceding five days.  (R. 273.)  Plaintiff described the pain as severe and identified associated symptoms including bruising, decreased mobility, difficulty initiating sleep, joint tenderness, limping, and numbness, swelling and tingling in the legs.  (*Id.*)  On examination, Dr. DeArmitt noted that Plaintiff's gait was normal, and her exam was normal.  (R. 274.)  He assessed tarsal tunnel syndrome and noted an orthopedic referral for evaluation and treatment.  (*Id.*)

When Plaintiff saw Dr. DeArmitt in March 2013 for an unrelated

problem, musculoskeletal physical examination showed "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  Left foot/ankle: no joint deformity, heat, swelling, erythema or effusion.  Full range of motion." (R. 277.)  Psychiatrically, Dr. DeArmitt noted that Plaintiff was oriented to time, place, person, and situation; she had normal insight and exhibited normal judgment; and she demonstrated the appropriate mood and affect.  (*Id.*)

In June 2013, when Plaintiff was seen by Dr. DeArmitt for menopausal symptoms, the Review of Systems was negative for anxiety, depression and psychiatric symptoms, negative for gait disturbance, negative for bone/joint symptoms, joint swelling, muscle weakness.  (R. 281.)  Examination showed that Plaintiff had normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  (R. 282.)

Plaintiff was again seen for menopausal symptoms in October 2013 and for a rash in November 2013.  (R. 284-87.)  No other complaints were noted at these visits and physical examinations were unremarkable other than for the presenting problem.  (*Id.*)

On December 12, 2013, Plaintiff saw Dr. DeArmitt for back pain radiating into her right thigh.  (R. 288.)  Associated symptoms included decreased mobility, tenderness, tingling in the legs, and weakness.  (*Id.*)  Dr. DeArmitt noted that Plaintiff's gait was antalgic, and her lumbar spine was tender and exhibited mild pain

with motion.  (*Id.*)  He assessed sciatica.  (*Id.*)

On May 2, 2014, Plaintiff again complained of depression to
Dr. DeArmitt, reporting "somewhat difficult" functioning, anxiety,
depressed mood, difficulty concentrating, difficulty initiating and
maintaining sleep, excessive worry, diminished interest or
pleasure, and racing thoughts.  (R. 291-92.)  Her physical
examination was unremarkable.  (R. 293.)  The plan was to continue
Plaintiff's medications.  (*Id.*)

b.  ***Pennsylvania Neurosurgery & Neuroscience Institute, Inc.***

On referral from Dr. DeArmitt, Plaintiff was seen by Salim
Qazizadeh, M.D., at the Pennsylvania Neurosurgery & Neuroscience
Institute, Inc., on April 13, 2012.  (R. 214.)  Dr. Qazizadeh
recorded the following history:

> Ms. Freeman is a 51-year-old woman who
> had surgery in November 2010 for right tarsal
> tunnel syndrome.  She improved to some extent
> but then again she has had recurrence of the
> events.  She also started having pain in the
> left foot.  She had EMG and nerve conduction
> study done, which suggested possible
> periperal neuropathy versus tarsal tunnel in
> the left foot.  She does not have lower back
> pain.  She was started on Lyrica 75 mg twice
> a day for her pain.  She is here for further
> evaluation and management.  She does not have
> paresthesias in the upper extremities.  The
> pain is confined to both lower extremities
> and mostly both feet.

(R. 214.)  Sensory exam was significant for pain and discomfort in
the lower extremities.  (R. 216.)  Plaintiff was able to feel
pinprick and Dr. Qazizadeh noted she was "a little bit too

7

sensitive in both feet." (R. 216.) Dr. Qazizadeh also noted that Plaintiff walked with some difficulty due to pain in both feet, mostly on the right side. (*Id.*) Due to uncertainty about the exact etiology of her symptoms, Dr. Qazizadeh decided to refer Plaintiff to Mamta Verma, M.D., who had more experience concerning distinguishing between peripheral neuropathy and tarsal tunnel. (R. 216.)

Plaintiff saw Dr. Verma on May 15, 2012. (R. 210.) Dr. Verma recorded that the Lyrica prescribed for the foot problem was replaced with Cymbalta due to side effects and that the new medication seemed to help to some extent. (*Id.*) After reviewing the EMG/nerve conduction study, Dr. Verma did not think the results were consistent with the peripheral neuropathy diagnosis. (*Id.*) Physical examination showed that deep tendon reflexes were symmetrically decreased and her feet were hypersensitive. (R. 211.) Psychiatrically, Dr. Verma noted "[n]o unusual anxiety or evidence of depression." (R. 211.) Dr. Verma provided the following summary:

> This is a woman who has very hypersensitive feet, going from the ankles down. The symptoms may be consistent with peripheral neuropathy, but the EMG is not. I would like to repeat the EMG but at this time, because she is so hypersensitive, I do not think I will be able to do the test. At this time, I do think she needs more strong pain control. I prescribed her Lidoderm patches, which is more local and may help with the symptoms. Meanwhile, I will also get blood tests to look at etiology of her

8

> peripheral neuropathy.  I did discuss with
> her that in peripheral neuropathy in 75% of
> people we do not find a cause but in 25% of
> people, it is idiopathic.  I discussed
> different causes of neuropathy; hence, the
> blood work.  In the future, we may consider
> repeating the EMG.  I also discussed with her
> new therapy, which is the ankle block.  It is
> done by Dr. Romano at Premier Medical and
> Rehabilitation Center.  I would like her to
> consider that in the future if the Lidoderm
> patches do not work.

(R. 212.)

In June 2012, Dr. Verma reiterated that she was not convinced of the peripheral neuropathy diagnosis.  (R. 207.)  She recorded that Plaintiff reported being "50% better" due to a combination of increased dose of Cymbalta and being retired.  (*Id.*)  Dr. Verma noted that Plaintiff was ready to have another EMG and she would be scheduled for both lower extremities.  (R. 208-09.)

On July 18, 2012, Plaintiff had EMG/nerve conduction studies. (R. 220-21.)  Dr. Verma concluded the studies were normal with "no electrodiagnostic evidence of a lumbosacral radiculopathy affecting the right side or plexopathy, or generalized polyneuropathy affecting either of the lower extremities."  (R. 221.)

At her September 2012 office visit, Plaintiff noted improvement but said she still had difficulty putting her feet down as it caused a lot of numbness and tingling.  (R. 204.)  Dr. Verma opined that Plaintiff had small fiber neuropathy and referred her to Dr. Romano for ankle block injections to see if that would help

9

with pain.  (R. 205.)  Dr. Verma recorded that Plaintiff was to continue on Cymbalta and would return in six months.  (*Id.*)

### c.  *Brett A Himmelwright, D.O.*

In February 2012 Plaintiff saw Brett A. Himmelwright, D.O., who had performed the November 2010 tarsal tunnel release.  (R. 198.)  Plaintiff continued to have tenderness with palpation of the right ankle in area of the tarsal tunnel.  (*Id.*)  She had good range of motion of the ankle, good sensation and "minimal Tinel's with percussion of the tarsal tunnel."  (*Id.*)  X-rays showed excellent alignment of the ankle, and no evidence of tilt or degenerative change.  (*Id.*)  Dr. Himmelwright noted that Plaintiff still had symptoms similar to her preoperative complaint and, therefore, a new EMG was recommended with further evaluation to be determined afterwards.  (*Id.*)

Plaintiff again saw Dr. Himmelwright on February 13, 2013. (R. 228.)  He noted her history of right tarsal tunnel release, adding that it "took quite a while to resolve, but she is doing great with that side."  (*Id.*)  Dr. Himmelwright recorded that Plaintiff presented with essentially identical symptoms on the left side and she had been treated for some peripheral neuropathy but her symptoms were "quite irritating."  (*Id.*)  After noting that Plaintiff ambulated without any assistive devices or immobilization, Dr. Himmelwright reported that examination of the left ankle showed exquisite tenderness with palpation posteriorly

10

at the tarsal tunnel, good range of motion, pain with palpation at the base of the foot, and a positive Tinel's at the tarsal tunnel. (*Id.*)  He diagnosed left foot tarsal tunnel syndrome and recommended a tarsal tunnel release to be performed in the near future.  (*Id.*)  Dr. Himmelwright opined that Plaintiff's recovery would be helped by the fact that she no longer worked in daycare. (*Id.*)

Dr. Himmelwright performed the procedure on March 11, 2013. (R. 349.)  Plaintiff returned for follow up on March 25, 2013, and Dr. Himmelwright noted that she was "coming along very nicely" and had seen some good improvement in her preoperative symptoms.  (R. 351.)  He recorded that Plaintiff had no specific pain, problems, or complaints.  (*Id.*)  Dr. Himmelwright noted that Plaintiff was "allowed to return back to essentially normal activities.  Some simple restrictions were given."[1]  (R. 352.)

### d.  *Michael F. Lupinacci, M.D.*

On referral from Dr. Verma, Plaintiff saw Michael F. Lupinacci, M.D., a pain specialist, on December 13, 2013.  (R. 332,

---

[1] In Defendant's review of evidence, she misquotes Dr. Himmelwright, asserting that he "indicated she was 'allowed to return *back to work* to essentially normal activities.'" (Doc. 7 at 8 (quoting R. 352) (emphasis added).)  Dr. Himmelwright never mentioned work.  (R. 352.)  Further, with Dr. Himmelwright's notation that Plaintiff could return to normal activities (as quoted in the text), he would not have anticipated a return to work in that he noted at her preoperative visit that she was no longer working in daycare and this would be helpful to her recovery from surgery.  (R. 228.)

333.)   She presented with chief complaints of bilateral hip and leg numbness, pain, and pins and needles sensation.  (R. 332.) Plaintiff reported the pain was continuous, 7/10 in severity, aggravated by sitting more than fifteen minutes and alleviated by home exercise program.  (*Id.*)  Dr. Lupinacci noted that examination showed Plaintiff to be in mild discomfort and she was able to ambulate independently but with a cautious gait.  (R. 331, 333.) He made the following musculoskeletal/neurological examination findings: "Bilateral lower extremity reveals decreased pinprick and light touch from her mid thighs distally.  Her lower extremity strenght is 4+/5.  Straight-leg raising is negative.  Babinski's and Hoffman's are negative.  Bilateral hip, knee, and ankle range of motion is within normal limits.  She has no lumbosacral paraspinal muscle tenderness."  (R. 331.)  His impression included peripheral neuropathy, and chronic bilateral leg pain, numbness, and tingling.  (*Id.*)  In his correspondence to Dr. Verma dated December 17, 2013, Dr. Lupinacci said that he discussed Plaintiff's options with her, noting that Plaintiff seemed to have exhausted medication management of her symptoms and she had said Cymbalta was not helping.  (*Id.*)  He also reported that Plaintiff was amenable to a trial of acupuncture for possible symptomatic control and she would think about a possible trial of neural stimulation.  (*Id.*) Plaintiff was to be seen for follow up in six weeks.  (*Id.*)

Plaintiff saw Dr. Lupinacci again in April 2014.  (R. 326.)

12

He noted that Plaintiff had "failed all conservative and medications.  She has chronic bilateral lower extremity numbness tingling and pain from her hips to her toes.  Previously she was going to try acupuncture but her out of pocket expenses were too high." (*Id.*)  Dr. Lupinacci observed that Plaintiff walked with a normal gait and station, she had good deep tendon reflexes and good mobility of all extremities, and she had 5/5 motor strength bilaterally.  (*Id.*)  He scheduled Plaintiff for a spinal cord stimulator trial and directed her to continue on Cymbalta.  (R. 327.)

On May 19, 2014, Dr. Lupinacci noted that Plaintiff's symptoms continued and her psychological evaluation to assess her candidacy for a spinal cord stimulator trial was scheduled for the next morning.  (R. 323, 325.)  He also noted that he completed a disability form.  (R. 325.)

**2.  Opinion Evidence**

On May 14, 2014, Dr. DeArmitt completed a questionnaire identifying Plaintiff's diagnosis as neuropathy.  (R. 235.)  He opined that Plaintiff could stand/walk continuously for ten minutes and sit continuously for thirty minutes; she could stand/walk for a total of one hour in an eight-hour day and sit for seven hours in an eight-hour day; she could never climb, crouch, or crawl, occasionally stoop and kneel, and frequently reach, push and pull. (R. 235-36.)  He answered "yes" to the question of whether, in

13

spite of the prescribed treatment, Plaintiff had peripheral neuropathies with significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station. (R. 236.)  Dr. DeArmitt noted there was no anticipated end to the limitations/restrictions identified.  (R. 237.)

Dr. Lupinacci completed a questionnaire on May 19, 2014, identifying Plaintiff's diagnosis as peripheral neuropathy with bilateral lower extremity pain.  (R. 302.)  He opined that Plaintiff could stand/walk continuously for ten minutes and sit continuously for ten minutes; she could stand/walk or sit for a total of one hour in an eight-hour day; and she should avoid all identified environmental conditions.  (R. 302.)  Dr. Lupinacci also concluded that Plaintiff could occasionally do all identified postural activities.  (R. 303.)  He noted that Plaintiff should avoid lifting or carrying ten pounds.  (*Id.*)  He also noted she was likely to experience numerous problems if she exceeded the identified restrictions.  (*Id.*)  Dr. Lupinacci answered "yes" to the question of whether, in spite of the prescribed treatment, Plaintiff had peripheral neuropathies with significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station.  (R. 303.)

3.    **Hearing Testimony**

Plaintiff testified that she could walk for about fifteen minutes because of the problems with her feet--chronic pain, numbness, tingling, and burning.  (R. 35.)  She said she could stand in one spot for ten minutes because of problems related to scoliosis and the rod in her spine.  (R. 36.)

Plaintiff explained that she had worked for twenty-three years as a state licensed child daycare provider in her home, taking care of up to six children at a time.  (R. 37.)  She stopped working on June 1, 2012, for health reasons.  (R. 38.)

Plaintiff testified that she had begun seeing a pain specialist, Dr. Lupinacci, about six months earlier on the referral of Dr. Verma.  (R. 40-41.)  Plaintiff said Dr. Verma referred her because she had tried several medications and had side effects without much relief and Dr. Verma thought a pain specialist could perhaps offer her alternatives.  (R. 41.)  Plaintiff identified acupuncture and a neurostimulator as alternatives suggested by Dr. Lupinacci but acupuncture was not feasible because it was not covered by her insurance.  (*Id.*)  At the time of the hearing, Plaintiff said she was a candidate for the neurostimulator and had been cleared by a psychologist to try it.  (R. 41-42.)

ALJ Riley asked VE Brian Bierley to consider a hypothetical individual of the same age, education and work experience as Plaintiff who could do light work, could stand/walk for fifteen minutes at a time, who needed a sit/stand opinion, could never do

15

foot control operations or ladders, could occasionally use stairs, balance, kneel, crouch, and crawl, who needed to avoid concentrated exposure to hazards, and could do work limited to simple/routine/repetitive tasks.  (R. 47.)  The VE testified that such an individual could not do Plaintiff's past work but could do other jobs that existed in significant numbers in the national economy such as small products assembler, electrical accessories assembler, and plastic products assembler.  (*Id.*)  The ALJ then asked whether the hypothetical individual could do any jobs if he added the limitation that the individual could not engage in and sustain work activity on a regular and continuing basis for eight hours a day, five days a week.  VE Bierley said she could not. (*Id.*)

**4.   ALJ Decision**

ALJ Riley issued his decision on May 29, 2014, considering evidence submitted up to that date.  (R. 18-26.)  He made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> 2.   The claimant has not engaged in substantial gainful activity since June 21, 2012, the alleged onset date (20 CFR 404.1571 et seq.).
>
> 3.   The claimant has the following severe impairments: depression, neuropathy and tarsal tunnel syndrome (20 CFR 404.1520(c)).

16

4.   The claimant does not have an impairment
     or combination of impairments that meets
     or medically equals the severity of one
     of the listed impairments in 20 CFR Part
     404, Subpart P, Appendix 1 (20 CFR
     404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the
     entire record, the undersigned finds
     that the claimant has the residual
     functional capacity to perform light
     work as defined in 20 CFR 404.1567(b)
     except the claimant can stand and walk
     15 minutes at a time, requires a
     sit/stand option, and no foot control
     operations or climbing ladders.  The
     claimant can occasionally climb stairs,
     balance, stoop, kneel, crouch and crawl
     and needs to avoid concentrated exposure
     to hazards.  The claimant is limited to
     simple routine repetitive tasks.

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565).

7.   The claimant was born on March 1, 1961
     and was 51 years old, which is defined
     as an individual closely approaching
     advanced age, on the alleged disability
     onset date (20 CFR 404.1563).

8.   The claimant has at least a high school
     education and is able to communicate in
     English (20 CFR 404.1564).

9.   Transferability of job skills is not
     material to the determination of
     disability because using the Medical-
     Vocational Rules as a framework supports
     a finding that the claimant is "not
     disabled," whether or not the claimant
     has transferable job skills (See SSR 82-
     41 and 20 CFR Part 404, Subpart P,
     Appendix 2).

10.  Considering the claimant's age,
     education, work experience, and residual
     functional capacity, there are jobs that

17

exist in significant numbers in the
national economy that the claimant can
perform (20 CFR 404.1569 and
404.1569(a)).

11.  The claimant has not been under a
disability, as defined in the Social
Security Act, from June 1, 2012, through
the date of this decision (20 CFR
404.1520(g)).

(R. 20-26.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[2]  It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a
substantial activity; 2) whether the applicant is severely
impaired; 3) whether the impairment matches or is equal to the

---

[2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less that 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

only if his physical or mental impairment or
impairments are of such severity that he is not
only unable to do his previous work but cannot,
considering his age, education, and work
experience, engage in any other kind of
substantial gainful work which exists in the
national economy, regardless of whether such
work exists in the immediate area in which he
lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he
applied for work.

42 U.S.C. § 423(d)(2)(A).

requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 25.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that Acting Commissioner's decision should

22

be reversed or the matter should be remanded for the following reasons: 1) the ALJ erred by failing to find that Plaintiff met the listing for peripheral neuropathies; 2) the ALJ erred by affording insufficient weight to her treating physicians' opinions and ignoring their uncontradicted opinions; 3) the ALJ erred in not properly evaluating Plaintiff's mental impairments; 4) the ALJ erred in finding that Plaintiff had the RFC to perform light work; 5) the vocational expert's testimony was flawed because it was given in response to an incomplete hypothetical; 6) the ALJ's determination that Plaintiff was not entirely credible was not adequately explained; and 7) the ALJ erred in relying on the grid as a framework for his decision.  (Doc. 6 at 2.)

### A.    *Peripheral Neuropathy Listing*

Plaintiff alleges the ALJ erred by failing to find that Plaintiff met the listing for peripheral neuropathy, which is listing 11.14.  (Doc. 6 at 7.)  Defendant maintains that Plaintiff did not meet the listing requirements.  (Doc. 7 at 16.)  I conclude Plaintiff has not shown that this claimed error is cause for reversal or remand.

ALJ Riley concluded that Plaintiff's neuropathy did not meet listing 11.14 because her condition did "not result in sensory or motor aphasia resulting in ineffective speech or communication or significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and

dextrous movements, or gait and station." (R. 20-21.)

Plaintiff points to the questionnaires completed by Dr. DeArmitt and Dr. Lupinacci in support of her argument that she meets the listing. (Doc. 6 at 7; Doc. 8 at 2.) As set out above, both physicians answered "yes" in a check-the-box form to the question of whether, in spite of the prescribed treatment, Plaintiff had peripheral neuropathies with significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station. (R. 236, 303.) Plaintiff does not address the ALJ's determination that these opinions where not supported by the doctors' treating notes which indicated normal gait, normal range of motion, normal muscle strength and stability in the lower extremities. (*See* R. 24.) Nor, in the context of this claimed error, does Plaintiff refute that the ALJ accurately depicted the notes or that the record contains contradictory notes related to the specific listing 11.14 requirements. Thus, I conclude Plaintiff has failed to show that the ALJ erred at step two on the basis alleged.

**B.    *Treating Physicians' Opinions***

Plaintiff maintains the ALJ erred by affording insufficient weight to her treating physicians' opinions and ignoring their uncontradicted opinions. (Doc. 6 at 9.) Defendant maintains the ALJ properly considered the treating physicians' opinions. (Doc. 7

at 11.)   I conclude the ALJ's consideration of the treating physicians' opinions is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).   Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."   20 C.F.R. § 404.1527(c)(2).[3]   "A cardinal principle

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.

---

reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46. *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the ALJ--not treating or examining physicians or State agency consultants--must make the ultimate disability and RFC determinations." 551 F. App'x at 46 n.7 (quoting *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence, *Morales v.*

27

*Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

Here the ALJ did not undermine the treating physicians' opinions without explanation, but rather he found they were not well-supported for specific reasons. (R. 24.)  The problem with the assessments is not that ALJ Riley found a lack of support in treating notes for certain conclusions expressed in the opinions (*id.*) but that he fails to address certain probative evidence and mischaracterizes the record concerning treatment Plaintiff received for her peripheral neuropathy.  Although the ALJ notes that Plaintiff was recommended for trial acupuncture to manage her

symptoms (R. 23), he does not identify the reason for the alternative treatment suggestion or the fact that Plaintiff had been approved for a trial of neuro stimulation.  Importantly, Dr. Verma, Plaintiff's neurologist, referred Plaintiff to Dr. Lupinacci, a pain specialist, because conservative treatment had failed.  (R. 326, 331.)  Dr. Lupinacci expressed no doubt that Plaintiff experienced the symptoms/pain she alleged and he suggested alternative treatments to address them.  (R. 323-32.) This evidence renders the ALJ's statement that "the record fails to show that the claimant requires more than conservative treatment measures" (R. 24) inaccurate.  Because the treatment history was also identified as a basis for undermining the treating physicians' opinions, I cannot conclude the weight afforded the opinions is supported by substantial evidence.  *Dobrowolsky*, 606 F.2d at 406 (if an ALJ has not not sufficiently explained the weight given to all probative evidence, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.")  Thus, I conclude remand is required for proper consideration of probative evidence regarding Plaintiff's treatment for peripheral neuropathy and her treating physicians' assessments of associated symptoms/pain.[4]

---

[4] In response to Plaintiff's assertion that there is no medical evidence contradicting the treating physicians' opinion, Defendant points to Dr. Himmelwright's orthopedic records,

## C.    *Mental Impairments*

Plaintiff contends the ALJ erred because he did not properly evaluate her mental impairments.  (Doc. 6 at 11.)  Defendant argues that substantial evidence supports the ALJ's evaluation of Plaintiff's depression.  (Doc. 7 at 18.)  I conclude Plaintiff has failed to show the ALJ erred on this basis.

Plaintiff specifically points to authority which indicates that evidence of a mental impairment requires that the agency make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review. (Doc. 6 at 12 (citing 42 U.S.C. § 421(h); *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999); *Andrade v. Secretary*, 985 F.2d 1045 (10th Cir. 1993); 20 C.F.R. § 404.1520(a)).)  Plaintiff further asserts that, at the very least, a PRT form must be completed and signed by a medical consultant or the ALJ and here there is no such document in the record.  (*Id.* (citing *Plummer*, 186 F.3d 422).)

---

specifically his February 2013 office visit notes.  (Doc. 7 at 15.) Upon remand, consideration of the treatment timeline is appropriate in that the February 2013 notes precede Plaintiff's referral to Dr. Lupinacci because of failed conservative treatment by almost one year.  Further, Defendant's reliance on a statement purportedly made by Dr. Himmelwright that Plaintiff could "return back to work" (Doc. 7 at 15) is unavailing because, as noted previously, *see supra* n.1, Defendant misquotes the record.  Dr. Himmelwright's actual statement provides no support for the proposition that he determined that Plaintiff was able to work: Dr. Himmelwright knew that Plaintiff had not been working, he thought her retirement from daycare work would aid her recovery from surgery, and he did not mention "work" in his Plan--he said Plaintiff was "allowed to return back *to essentially normal activities*" which at that time did not include work.  (*See* R. 352 (emphasis added).)

Defendant maintains that this argument is disingenuous in that Plaintiff did not mention any mental health issues in her disability application or her function report and the first time she raised depression as an issue was at the ALJ hearing.  (Doc. 7 at 18.)  Defendant adds that because depression was not raised as an impairment initially, it was not being evaluated at the time of the initial decision and the February 22, 2013, initial decision did not contain a PRT form.  (*Id.*)  On this basis, Defendant concludes Plaintiff's argument is illogical and impossible: the agency cannot address allegations of impairments that claimants have not raised.  (*Id.* at 19.)

I agree with Defendant that Plaintiff's argument does not reflect the realities of the timeline of this case.  As Plaintiff presents no other criticism of the ALJ's mental impairment assessment, I conclude she has not presented any basis for remand on this issue and the claimed error is without merit.

### D.   *Residual Functional Capacity*

Plaintiff's errors regarding light work, credibility, and omissions from the hypotheticals posed to the VE all relate to allegedly flawed RFC findings.  (Doc. 6 at 12-16.)  Because the flaws in the ALJ's assessment identified above in relation to his consideration of Plaintiffs' treating physicians' opinions also impact these matters, further consideration and reevaluation of all claimed errors related to the residual functional capacity

31

determination is warranted upon remand.

## **V. Conclusion**

For the reasons discussed above, I conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: March 18, 2016